155147, Leif Halversen v. Raandy White. Arguments not to exceed 30 minutes per side. Ms. Parrish for appellant. Thank you. Good afternoon, Your Honors, and may it please the Court. My name is Catherine Parrish, and I'm here on behalf of Mr. Leif Halversen, along with my co-counselor, Mr. David Barron, who is sitting there at counsel table. This is a case that was infected with error from beginning to end and everywhere in between. The problems began with the indictment itself, which failed to specify the statute under which the Commonwealth ultimately sought Halversen's conviction. This resulted in Halversen's trial attorney designing and presenting an entire defense around undermining an element that the Commonwealth did not even need to prove in order to find Halversen guilty. The error leaked into deliberations as jurors consulted a Bible in the jury room as well as biblical scriptures, and it's perhaps most prevalent and clear in the prosecutor's penalty phase closing argument, in which a central theme was convincing the jury that Halversen would kill again. Now this type of argument, this court has already found to be error, even with the 2254D barrier, reversible error, in another case. And in that case, what was said was essentially that the jury was doing everything except signing a death warrant for another unnamed future victim. What's different in this case is that the prosecutor gave that future victim a name and a face in the form of the bailiff who was with the jury and with Halversen throughout the trial. In light of these errors, Halversen is under a death sentence today, despite the fact that he had no criminal history at the time of the crime and that no jury found beyond a reasonable doubt that he was a principal actor in any murder. For purposes of argument today, my plan is initially to talk first about the indictment due process claim and the associated ineffective assistance of counsel claim that are related to each other. From there, my intent is to move on to the sentencing phase closing argument claim and then move on to other claims as time permits and as this court has questions. First of all, with regard to the due process claim and the associated ineffective assistance of counsel claim, one of the following propositions must be true. Either the indictment failed to put Mr. Halversen's counsel on notice that Mr. Halversen could be tried and convicted as an accomplice or Mr. Halversen's lawyer made a mistake of law and was ineffective for not understanding the law in this regard. There's no reason why counsel might have thought, yes, that's within the scope of the indictment, but it would still be useful to his theory of the case to have the person not have shot. I mean, you have to show intent, right? So intent would be a little bit less clear if he didn't actually shoot someone. Well, we would have to show intent. That would be my question. Yeah. That's what I come down to. So first of all, Your Honor, because this issue was not raised at the post-conviction level, there isn't a clear record as exactly as to what Halversen's counsel's intent was. We did request a hearing on this issue, and we did not receive one. The evidence of his intent is in the trial record with regard to specifically in the closing argument, I'm sorry, in the portion of the trial where they were talking about the closing instructions, and Halversen's attorney very clearly says, my understanding is that under 6.1, my client could not be charged or convicted as an accomplice. This issue of ineffective assistance of counsel for not knowing that the law was that you could be within the scope of the indictment without actually shooting, that's the nature of it, right? When was that first raised? It was first raised in a motion to amend the habeas petition, which was filed four days after the Martinez decision came down. It was not originally raised in the habeas petition because it was not raised at the state post-conviction level. And at the time of the – The district court did get at least a motion with respect to it. How did the district court rule then? The district court ruled on the motion that it would not accept that amendment. Essentially what it said is it looks at both the question of whether it related back and the timing of the motion that was filed. And it's our position that denying that amendment was an abuse of discretion. The ruling was essentially accepting that for purposes of that motion, it related back to claims that had already been raised, that had already been raised, because the indictment issue had already been raised and it came from the same core of operative facts. Did it relate back or did it not relate back? He assumed for purposes of his ruling that it did relate back. There was not a ton of analysis on the issue because he basically said, I'm assuming it does relate back. And we had made the arguments that it related back. It denied the amendment purely on the timing issue. Whose side has helped by having it relate back? Help me out on the law here. I'm sorry, can you repeat that question? Why is each side arguing about relating back? Because the standard for an amendment in a civil case is, first of all, the question of whether the sought-after claims relate back to claims presented in the original petition. And they need to or they can't? They need to relate back in order for the amendment to be permitted. So the law is you first look to the question of whether the claims related back. And secondly, once you've determined whether they relate back, a court is to look at the timeliness issue and whether they were timely raised. Because if they didn't relate back, they would be untimely? Is that the idea? If they didn't relate back, the amendment would not be permitted in the court. It's not necessary even to reach the timeliness issue. So in this case the court didn't decide that or it did? The timeliness issue or the relation back issue? Relation back. The district court said it's assuming, it's accepting for the purposes of its decision that it related back. It didn't directly decide that. But then found it was untimely. But then found it was untimely, yes. And denied the amendment. And denied the amendment, exactly. And the amendment was submitted only four days after the Martinez case came down. And if you look at this court's decision in the Jones case, which we cited in our briefing, this court has remanded at least once to allow an amendment in light of a Martinez decision. And I believe that one, it was a much longer period of time. It's either two months or two years. But in this case, it was filed four days after the Martinez came down. And that was the first, the Martinez decision came down. And that was the first opportunity for there to be cause for excusing the procedural default. Had the claim been raised in the original habeas petition, it could have been considered a frivolous claim because there was no way for, there was no cause for excusing the procedural default. So our position on that issue is that particularly in light of the change in law under Martinez, which I think all courts have acknowledged, that in every circuit prior to Martinez, Coleman was the law of the land. And Martinez was a little bit of a surprise, I think, for all of us. And so particularly in light of that change in law, that it would, that to, in light of that and in light of the timing of that amendment. The claim was defaulted in the first place. That's not a great issue. The ineffective assistance of counsel claim with regard to it, it just simply was not brought up in post-conviction. Why the post-conviction lawyers didn't bring it up is not entirely clear. The post- They brought a number of ineffective assistance claims up, or they didn't? There were ineffective assistance. There was an ineffective assistance of counsel claim with regard to mitigation brought up. There were certain other claims that were brought up, yes. Why it wasn't brought up, it's unclear. We do have an affidavit in the record from the direct appeal counsel, who were also the post-conviction counsel, who said at the time of the filing of the original petition, and they said essentially, at least with regard to the direct appeal, that they raised every claim they could think of and there weren't strategic reasons for eliminating claims. Based on that affidavit, I think it's fair to kind of presume they took the same approach with regard to post-conviction, but there hasn't been any evidence presented as to this issue. So we don't have a clear record with regard to that. Okay. The other issue with regard to that, so with regard to the ineffective assistance of counsel issue, I think this court's precedent in Jones establishes that an amendment is appropriate. Recently there was also the Supreme Court case in Buck, which we had submitted to the court a 28-J letter on as well, where the Supreme Court even acknowledged the change in law that Martinez caused and basically said you can't expect attorneys to have brought up this issue before because Coleman was established in all circuits to be the law of the land. And Buck as well, it was a longer time period when they raised it than the time period in this case. In this case, it was four days. I'm not sure which way that cuts. If you come down in four days, it sounds like maybe you were anticipating this and could have anticipated it. I mean, I'm not sure why you emphasized so much the four days. In 30 seconds, you would have said, wow, this is something you could easily anticipate. Well, I think there is a distinction between 30 seconds and four days to some extent. I think four days was sufficient time. It's as fast as lawyers go. It is. These are lawyers on the case who are watching these cases very quickly and know that this is going to be an issue. But I think one of the issues in the timing as well was the issue of prejudice. When looking at timing, the law says let's look at prejudice to the other side. At this point, there hadn't been a hearing. There hadn't been factual development of issues. And it was still some time after that that the court made its decision on the underlying case. And there wasn't any real prejudice to the other side as a result of that delay. There's been a lot of delay in this case, though, I guess. There has, Your Honor. There was plenty of delay in the state post-conviction process as well. Certainly, all of those delays are not delays to be attributed to Mr. Halverson. Delays are just normal part and parcel, I think, of some things that were happening in the case. When you get up to around 25 or 30 years, you might expect judges to want to move it along. That's true, Your Honor. Although 25 or 30 years, it has been a significant amount of time since the conviction. However, with regard to the timing, I think the law is, with regard to the timing, that you're looking at the prejudice to the other side. And that's part of why we feel it was an abuse of discretion. And I think that's also supported by the precedent in this court and Jones, as well as some other cases that we cited to from other circuits which have made similar decisions, as well as the Supreme Court's decision in Buck as well. I want to just talk briefly about the sentencing phase closing argument, as well. Because, and this is a case, one of the cases we relied on in making this argument in our brief was this case of Bates v. Bell. And this is a very comparable case to Bates v. Bell. It was a case out of this circuit that came in the early 2000s. And one of the things that they said in Bates, and in Bates, too, it was the same position we are in here, where there was a 2254D barrier that did need to be overcome. And this court found in that case that it had been overcome. One of the things that this court said in Bates in emphasizing why these comments, the closing comments, were such a problem, they commented that the prosecuting attorney had structured the entire closing argument around the idea that it was an inescapable fact that that person would kill again. We see that in the closing argument in this case, as well. And actually, some of the cases cited by the Commonwealth, I think, actually support what we're saying. In Hicks v. Collins, where they did not find, or where this court, I should say, actually did not find the comments to be egregious enough to merit a reversal. One of the things they said is, well, this wasn't really an improper attempt to compare or associate this defendant with a feared and highly publicized group. That language in Hicks, which they said wasn't going on in Hicks, is exactly what was going on in this case. The entire first part of the closing argument was talking generally about killers and murderers and what these killers and murderers do, and you can't expect these killers and murderers not to kill again. And the prosecutor specifically cited these names, these names of Charles Manson and all of these other notorious killers, and used those names and placed Mr. Halverson and Mr. Willoughby in the context of these particular notorious killers, and was essentially arguing, this is what killers do. The argument itself was not based... on a rhetorical flourish, that these are the kinds of... look at these people you're familiar with, they can still kill because they're alive, but obviously if someone's not alive, he can't continue to kill. That's for instance, and it makes it colorful, and maybe that's bad, but it's a little bit of an exaggeration to say that he was comparing them to those people, other than to say that they were alive, as opposed to dead, or dead as opposed to alive. I think in light of the entire closing argument, it does seem like it's an attempt to compare and associate. The prosecutor repeatedly, rather than using Halverson's or Willoughby's names specifically, or talking specifically to the evidence of this case... Does that deference apply to this issue? Yes, this is something we're evaluating. I can see what you're saying about, yeah, it sort of lends some color. It's not just a rhetorical flourish, it's using names of people who are reprehensible. Right. But the state court said that it didn't see that they really were used that way, or had that effect. Yes, and... So then we've got to say, was that decision reasonable or not? Right, and I think there are three issues with that. First of all, the state court, in determining that it was reasonable, was not looking... Not was reasonable, not unreasonable. I'm sorry, yes. The state court, in determining that these comments were okay, essentially, first of all, looked at the guilt phase, basically saying there was a ton of evidence against these guys, so these comments were probably not prejudicial. And that commentary about the evidence of... Did they say they were not prejudicial, or did they say they were within the range of what was okay to do? Well, they said they were generally a fair commentary on the evidence, which... Why wasn't that reasonable, or at least not unreasonable? I... That's the question. Right. You could certainly conclude that they weren't proper to be used. Right. But the court is saying it was within the range of what could be used, because they looked at them as a rhetorical flourish rather than as a direct comparison. We might look at them differently, but I'm not sure it would be unreasonable to look at them that way, would it? Well, there are two things. I think it was in reasonable application of the law for what I said previously, that it was really only looking at the context of the guilt phase and the effect on guilt phase, not on the effect of sentencing. But secondly, we think it's in a... I thought you said it was for whether it was prejudicial or not. Right. I'm asking a question about whether it was reasonable to say that it was okay to do this. Right. So our interpretation is that it's also the comments themselves and the analysis with regard to those comments are also an unreasonable application of the facts, because the vast majority of this was not a commentary on the evidence in this case. And that's exactly what the state court said, that it was a fair commentary on the evidence of the case. But there is a big bulk of time when looking at these comments in the context of the overall closing argument where there is no discussion whatsoever of the facts of the case. Again, he's talking generally about murders are going to kill again. The lawyer could sort of give a speech in favor of the value of capital punishment. I mean, after all, he's trying to convince them to impose it rather than something else. Or he could not. Your Honor, I think the extent to which that's allowable is debatable under the law and depends somewhat on the context of those comments. So when talking about deterrence arguments, for example, sometimes the court has ruled, well, these send-a-message-to-the-community arguments are okay if they're based on the evidence and talking generally about capital punishment. But in this case, so for example, and those are some of the cases cited... Alice, pardon me, I want to understand your argument. You're saying it's okay if they're talking generally or if it's related to the evidence. I thought you said both, but those seem to be two...  Yeah, I see what you're saying. So, Your Honor, I think the issue is here, the future dangerousness argument, partly. It was not based on the evidence. Comments that are giving general background on capital punishment, there have been some rulings that those comments can be deemed as proper. But in this case, we're talking about when you look at the volume and the quality of those arguments, what the prosecutor was essentially arguing is this guy is a convicted murderer and therefore he should be executed, which the law actually requires a much more detailed and thorough analysis of whether a person should be executed. There's very clearly established law that the decision of death requires an analysis of much more than simply whether a person has committed that. The jury instructions would have cabined that, would they not? The jurors were told what they should evaluate with respect to imposing the sentence of death. Yes, the jury instructions did give an appropriate instruction in terms of looking at aggravating and mitigating... All the factors you're talking about would have been how they understood that they were to evaluate this, I take it. Yes, the factors are within the jury instructions. There was no specific, but if you look, for example, at the Goff case where they found that the comments were improper, but there wasn't prejudice... You're talking about closing argument. Yes, closing argument. In the Goff case, there was also an additional instruction, limiting instruction given to the jury saying, prosecutor's argument is an evidence, you've got to just look at the law. Such a limiting instruction with regard to the argument was not given in this case. While there were jury instructions given in terms of what they could evaluate, the jury instructions were also fairly broad and said, essentially, you have to look at aggravating and mitigating factors. If just because you find these mitigating factors doesn't mean that you can't impose death if you still think this aggravator is there and death is still appropriate. So there was no instruction to the jury that would have counteracted the effect of these very inflammatory prosecutorial comments. Specifically, and the other thing I actually should comment on that, and just specifically, and again, I've already pointed out, pointing to a specific person in the courtroom who the jury had spent time with and saying this person's life is at risk. The other thing, Your Honor, you asked about... I mean, in context, doesn't he say the people whose lives are potentially at risk when we're talking in general are, for instance, the people who escort them and stuff like Mr. So-and-so? Right, like Mr. Different from saying he's at risk from this person. I think in the context of the overall arguments, it does sound like the prosecutor is saying he is at risk. And the prosecutor did specifically ask, are you willing to run at risk? Judge Rogers, you had asked previously about the 2254D barrier. There is one aspect of this argument that is not subject to 2254D, and that is the issue of the commentary on Mr. Halverson's constitutional rights. That issue was not brought up in state court, and so it is an issue of whether that default is excused by ineffective assistance of appellate counsel for failure to bring that argument up. And I think those comments themselves on Halverson's constitutional rights, that is pretty well established in Supreme Court law. If you look at Griffin v. California, Caldwell. With respect, though, that's one of the weaker arguments, that what he said was improper. I mean, it's just sort of, again, it's sort of like... We're talking about whether to punish this person who never gave his victims any constitutional rights. It's a little bit different from saying a defendant is a sleaze because we're giving him constitutional rights or because he's demanding his constitutional rights. Literally, it's very different. Well, and there were multiple comments, and I'm not sure if in our briefing we put the totality of the argument before that in there, but there were multiple comments throughout the closing argument commenting on Halverson's rights. And that question was asked right after a whole diatribe about the rights that Halverson had exercised. And previously in the closing argument as well, the prosecutor had commented specifically at a different place in the closing argument. He was talking about duty, which is another issue. But he was talking specifically about how the police had done their duty and been very respectful of Halverson's rights. So there was a big portion of the closing argument talking about Halverson's exercise of his rights and how we've seen that happen. And the comment came directly after that. I see my time is up, so I will see you in 30 minutes. You reserved some time.  Thank you, Your Honors. Thank you. Good afternoon, and may it please the Court, Mr. Barron and Ms. Parrish. With respect to the indictment and the lack of notice given to Mr. Halverson and his defense attorney, as noted, it was procedurally defaulted. Therefore, if you look at their excuse for that default, the ineffective assistance of appellate counsel, federal law and state law at that time was very clear that if you are indicted as a principal, you can be instructed or the jury can be instructed that you were an accomplice. And in this case, that's exactly what happened. All three defendants were indicted as principals. And after the evidence, the jury was instructed that Mr. Halverson could be found guilty as an accomplice, not only in the murder of Joe Norman, but also with respect to Jacqueline Green and Joey Durham. But as your opposing counsel argues, if you accept that, then it looks like counsel was ineffective by seeming to ignore that. That is their argument, right? That is their argument, and I respectfully disagree. As I stated in my brief, I think there's a difference between a legal argument and an actual misunderstanding. Quite often you find— Why would they make the legal argument? Why would they make the argument that he wasn't a shooter if it didn't make any difference? For the same reason you said earlier, it benefits his case. How exactly? It comes in two waves. First, it narrows the criminal liability he could face with respect to the intentional murder count. And secondly, because he wouldn't have the accomplice liability potentially. If his argument were to succeed, then it would limit him to being indicted as a principal and the jury to be instructed that he was a principal, and there wouldn't be an accomplice instruction. So it limits his criminal liability. I thought you said the accomplice instruction is contained within the general instruction about intent to commit the murder, right? That's what everybody supposedly knew. Well— Am I missing something? No, no, no. The argument they make— He killed and he killed. Right. The argument that he makes is that the way the indictment is written, you've got an intentional murder indictment with the intentional murder statute. There's no statute—there's no mention of accomplice liability and there's no citation to the accomplice liability statute. He cites the rule of criminal procedure and says, well, based on that, he hasn't had fair notice of this, he shouldn't be held liable for accomplice liability. The state of the law at the time is that's not correct. And when you look at— The argument she's arguing today, the part of the argument that she's emphasizing today, maybe because that's what I was asking about, I don't know, accepts all that argument. Well, and again— For the purposes of the more difficult argument, you need to accept—I mean we accept that, right? Well, within the context of trying to determine the state of the law in 1983, which I will readily admit at 10 years old, I didn't know the state of the law, and trying to go back and piece all this together, the intent of the prosecutor, which I know they deem irrelevant, but Mike Malone, who was the assistant prosecutor who actually argued this issue with the judge, stated, well, we've indicted him this way on purpose. This was by design so that he is eligible for accomplice liability. But if for some reason the judge buys the defense attorney, who's Michael Maloney, which is really confusing, but if they accept that argument, well then now there's a piece of intentional murder, this accomplice liability component, that's gone. And then I can take my argument about lack of evidence with regard to Lee Halverson being a shooter and I can completely undermine Susan Hutchins, who's the star witness for the Commonwealth. She's the one who— So the value of it is just to destroy the— The credibility of Susan Hutchins is a huge component of that. She's the one— Wouldn't we have to have testimony in order to see that that's what his theory was? Because on the surface it has some plausibility, right? No, well— It just seems like if you don't need to show that he shot and you spend the whole time saying that he didn't shoot— No, I don't think so because you're attempting to create doubt, and again, juries, they do wild things. They don't necessarily always— No, and I understand, but I— The first time I've seen it, it makes me think, I wonder if that's— Well, I would equate it to— Maybe we should find out if that's what he was trying to do. I would equate it to— If in contrast you got Mr.—I don't even know if Mike Maloney is still around, but you could get him and ask him, what were you thinking? Well, I would equate it— If he thought, well, I just didn't understand the law, that would be different from your explanation that you're supplying for him now. Sure, and I guess in my mind I would equate it to sufficiency arguments that every attorney makes directed verdict arguments because they feel like if they don't, they're going to be found ineffective. But nine times out of ten, watching those arguments as an appellate attorney, they're going through the motions. I'm not talking about that issue. Well, no, I know, I know, but— No, it's just one issue. I guess what I would say to— It's the longest issue they have. I need to understand what your position is. Okay, well, I would argue it's not their strongest issue primarily because the judge never even addressed it. It was in a motion to amend that was filed two and a half years after this case began. This case was extensively litigated. Their argument is they couldn't make that motion in a non-frivolous manner before Martinez. I mean, there's a force to that, isn't there? But they could because ground seven and ground 14 of their argument are ineffective assistance of counsel claims where they have taken these same issues that were labeled frivolous and actually argued claims that would fit under Martinez. But their response to that is that those weren't cases where the default was in the first—in the collateral trial counsel, but rather at the— That may be their argument, but that's not mine. That's not how I feel as far as what they did. You can look that up and see what the nature of those are. You can look at—it's ground seven and ground 14, and in both of those arguments, they make claims of ineffective assistance of counsel. Effective assistance of collateral— Of trial counsel, and those arguments were not made by collateral attack counsel. Yes, sir. And so— Those now? We'll answer that. Ground seven and ground 14 of their petition. And I raised that when they first filed their petition, and I raised it again when they filed their motion to amend, and that's part of the reason the motion— Their argument with respect to the timeliness is that even though it didn't have Supreme Court precedent to support that kind of ineffective assistance of counsel, they made similar arguments anyway, so they could have made them with respect to this. Exactly, and the timing, as you said, it cuts both ways. It suggests perhaps they were sitting on them for some reason, and I don't know that for a fact. I don't want to—definitely don't want to suggest that, but they were able to very quickly raise 11 claims. At the very least, if they had raised them earlier, they would have lost, wouldn't they? Well, not necessarily, because Martinez did the same thing, and that's part of the reason the judge denied it because— This could have been the Martinez case that goes to the Supreme Court. Exactly. That's exactly right, because Martinez—and that was part of the reason the judge denied it, because he said the difference between Halverson and Martinez is Martinez raised these claims in his petition, and he gets all the way to the Supreme Court, and now we have the Martinez rule. So for that reason, yes, I do not feel like it's their strongest argument because procedurally it's a mess, quite frankly. The idea is that having raised it, not knowing whether the law would change, they would have at least preserved it. Exactly. That's what Judge Bunning said. Yes, yes. And said the difference is that for sure it's now successful after Martinez, but pre-Martinez, it's just preserving the argument. Correct. And again, that would go to the order from Judge Bunning with regard to prejudice to the Commonwealth as well as the timing issue, the fact that they didn't raise them previously and they did raise other similar claims in their petition. What if we happen to disagree with you on that? What's the proper thing for us? I would— On the timeliness of it. What if, misguided from your perspective, we say that it was timely because five days earlier it would have been frivolous? I would suggest that at worst case scenario it has to be remanded for that issue. I'm not asking you what— Best case scenario for me it— I understand— I would argue that it would be— What do you advise as a lawyer to us to do in that situation? That it would be futile to do so because of the reasons I stated earlier with regard to the fact that making a legal argument that doesn't succeed doesn't mean you don't understand the law. I see. And— This is just the argument is that the court in error denied the motion to amend, right? Correct. Okay. Correct. Judge Rogers' question, do they get a chance to raise it then and it's not defaulted? Is that where we'd be? I guess so. Again, not knowing the full power of this court to deal with an issue like this where it's been— My, I guess, legal position would be something to the effect of the equivalent of a cert petition where the improvidently granted language was used where because the issue itself wasn't decided by the— Merits. By the district court on the merits that it didn't need to be a part of the appeal. Now, again, like I said, I would still argue that— The way you could still argue it is to say that the motion to amend was properly denied as futile rather than as— Right. Well, that's— But you've got to make a pretty strong futility argument for us to affirm that denial of the motion to amend on that ground, don't you? Right, and I feel like I do. I mean, if you look at the futility argument, they're making the argument. Claim five is the same argument that Senator Maloney made. So if it's not futile, you're talking about them bringing this exact same argument now. Why would they bring a frivolous claim to this court under ground five? Why is it frivolous? I didn't catch that. I would say it's frivolous. I'm not— It was frivolous because of Martinez. If you get that— No, yeah, I'm talking about claim five. Just the argument that Senator Maloney made to the trial court that wasn't appealed is with regard to this accomplice liability. They're raising this accomplice liability question now. So— That's the first part of the argument. I thought the second part of the argument that wasn't raised below was to assume that Senator Maloney and the court were on board. They understand what Kentucky law is, and that is that you can convict someone of murder even though the evidence that you show and that the jury buys just shows—doesn't show that he actually shot. Correct. Correct. That his whole defense was based on a misunderstanding or a misapplication of that understanding that you could get executed as a punishment even though you didn't do the shooting. Right. Right, and again, I think when you look at the merits that underpin the argument itself, that's why— Because they just can't win. Right. What is it that makes it that they just can't win? It can't be a Martinez argument. It's got to be a merits argument as to why they can't win. I guess you'd have to say, well, there's—I don't know. Somehow it weakened it or—what is the value of arguing that if it doesn't make a difference, I guess is what I'm asking. What is the value? What is the value of arguing that he didn't shoot him, that he wasn't the trigger finger, if you can just as easily be convicted if you didn't—if you weren't the trigger finger? Because it muddies the waters. It just muddies the waters. You have this person who—I mean Susan Hutchins, she bought the ammunition. She was on the scene. She's the only person who walks out of that house that doesn't have a gun who comes out alive. She picks up the shell casings. She takes the property off the victim. She helps clean the house. She helps clean the van. She cleans their clothes. She does a ton of things to assist in this crime. The defendant's attorneys, both Willoughby's and Halverson's, insinuated in their closing arguments that she had more of a role in this than she let on. She got a— Maybe he didn't even want it to go on. Is that the idea? Correct. It kind of makes sense. The evidence— It would seem to be easier to conclude— Well, the evidence showed that she carried a .38 pistol. A .38 was the other— Well, because it suggests that maybe she was involved somehow because Mitchell Willoughby says, I shot everybody. Susan Hutchins says, no, I remember hearing shots and closing my eyes, and when I opened them, they both had guns. Do you agree that Mr. Maloney tried to demonstrate to the jury that he wasn't the shooter? Yes. His job is to poke holes in the Commonwealth's case and create a reasonable doubt. And he didn't have a lot to work with. He had a very unsympathetic defendant. He had bad facts. He had a situation where the best way to do that is to just assassinate the credibility of the Commonwealth's main witness, and he did that. Intoxication was the main defense. This was not the only defense presented. But to the extent he had a job to do, why not take that chance? What's the harm in it? Other than just muddying the waters, which I can understand, but if it wasn't just muddying waters, but you're trying to come up with a theory where a thoughtful juror might say you're not guilty because you didn't shoot, you're suggesting, I don't know, that he didn't have the intent, he was there, he was part of it, but he never intended that they be shot? I'm suggesting that by muddying those waters, it creates enough doubt in the jury that maybe they don't want to go all the way to intentional murder. Maybe they want to go with manslaughter. You're only focusing on the guilt phase. Wouldn't it also make sense, if you anticipate that you might actually lose, that you're going to curry some favor with the jury in the mitigation phase if, in fact, you're not the shooter? Yes, absolutely. Well, and not necessarily because I guess that cuts both ways as well, but it definitely lets the jury know that there's not a whole lot of evidence here against Halverson. Now, his main focus in mitigation was duress, that he was under fear of Mitchell Willoughby, and for that reason he participated in this and he testified to that. But again, because of what was available in the guilt phase, I don't feel like it was an unreasonable choice on his part to make this argument and see where it goes because, again, there wasn't a whole lot else to go with here. And even the Commonwealth's attorney, when they make their closing argument in the guilt phase, Mike Malone says you don't have to like Susan Hutchins to believe her. Heck, I don't even like her. So this isn't somebody they're holding up as the best person in their community. They're doing the best they can with the evidence they've got, but there's a very good reason to, knowing that that's the way the Commonwealth even feels about this woman, to go after her and attempt to create some sort of doubt that might get you less than an intentional murder conviction. So in short, it's less likely that they intended if he didn't actually shoot them. Is that the idea? Yeah. Or at least there's not enough evidence to make it clear because everybody's saying different things. Mitchell Willoughby claims he shot everybody, then when he gets on the stand he says, no, I shot one person and then I blacked out, I don't remember what happened after that. So by the time the guilt phase is over, Susan Hutchins is the only person that's got Lief Halverson with a gun in his hand at that point. With respect to the prosecutorial misconduct claim, again, I guess I disagree with their characterization of the argument itself. If you look at the entire argument as a whole, the majority of it is spent talking about the mitigation evidence that they've presented and arguing in favor of the death penalty. As you said earlier, Judge Rogers, the value of the death penalty. They speak about deterrence and future dangerousness. I cited a case law in my brief where that's perfectly acceptable to do with reference to the famous murderers from other states. When you look at it in context, it's clear they're noting – or the Commonwealth's attorney who is Larry Roberts at this point arguing. He notes in particular that these people are able to potentially kill again because they weren't given the death sentence. So he's not comparing what these guys did to what those other people did. And as I stated in the brief as well, that also doesn't particularly help his case because these are famous serial killers and these guys aren't. They did kill three people, but they did it through the context of one particular incident. So if you see it in context, there's no comparison being made. And then on the flip side, when you're analyzing overall fairness, Joe Jarrell, who was Mitchell Willoughby's attorney, he gets up and specifically names four or five different serial killers and does compare them and says, hey, these guys didn't do anything as bad as these other guys did and they don't have the death penalty. So don't give our guy the death penalty. And in the context of – They don't make a right though. No, and I'm not saying they do. But if you're going to look at the trial and the analysis is looking at the overall fairness or trying to determine whether the Kentucky Supreme Court unreasonably applied Darden v. Wainwright, which looks at overall fairness, the two wrongs certainly don't make a right. I'm not suggesting that, but I am saying that in the context of what they're alleging the Commonwealth did, which I don't feel like they did, their guy did. Is the point that the jury heard both of those erroneous sorts of things? Sure. If you could argue that. Well, definitely because – The balance out. I mean that's I suppose what you're arguing. Definitely, and especially if – we won't really get into it, but the juror misconduct issue. I mean they – both of their closing arguments, they literally – I mean they sound like sermons. It would be hard to imagine those types of arguments being as common today. But again, we're talking about 35 years ago. Is that when Larry Roberts was the Commonwealth attorney? Correct, correct. So I don't feel like the Kentucky Supreme Court unreasonably applied federal law. And then with the comments with regard to the victim's constitutional rights, if you read the entire argument and you look at that terminology that's used in context, it is Mr. Roberts making an argument against showing these particular gentlemen mercy. And maybe using that example wasn't the best example, but it wasn't done in a way that I feel like would have made those comments. As the Kentucky Supreme Court said, they were brief and probably irrelevant but not necessarily improper. And in any event, viewed in the light of the entire argument, certainly wouldn't rise to the level of prosecutorial misconduct. He was simply trying to tell the jury, these guys are getting ready to get up and tell you to be merciful and don't show these guys mercy. They didn't show their victims mercy. We're looking for constitutional error, right? Correct, correct. So what do you say with respect to that? They didn't rise to the level of constitutional error? Is that your point? Well, just the point being that I don't – are you talking about the particular comment? Yeah, you were advising us that they both – the comments were sermon-like. Oh, yes. Yeah, with regard to their closing argument, exactly. They were – yeah, they were sermon-like, and they were definitely talking to Juror Garlington I think when they were doing that with regard to the juror misconduct issue, which I know was brought up in my opponent's opening but not really discussed but more or less there isn't anything that would suggest that this jury used a Bible in any way, shape, or form to decide this case. It was only used – it was only referenced with regard to a morning prayer. If there are no additional questions, I'll be seated. Thank you, counsel. Just to address a few quick things that came up in Mr. Kriegel's argument, Mr. Kriegel started out by talking about how there's a difference between a mistake of law that's an effective assistance of counsel and some confusion over the law. We cited in our brief Hinton v. Alabama – I think that was a 2014 case from the U.S. Supreme Court that I think is the lead case on this issue right now. And the facts of that case is that there was confusion of the law. In fact, what happened is the judge in that case had misstated what the law was, and the defense attorney didn't do the research and correct it. So I think looking at that case, this distinction between a mistake of law that might be reasonable and a mistake of law that may or may not be reasonable, I think that case makes it pretty clear that that distinction isn't really real. An attorney has the responsibility to know the law and to research the law when they don't know it. So if this court – The judge is confused. Is that what you're suggesting? In Hinton, yes. The judge is confused. Doesn't that make Mr. Maloney's conduct seem pretty reasonable? Maybe he can – in a case where he doesn't have a great argument, he can act like maybe not being the shooter is enough to get my client off. The jury might buy that. The judge is confused. Yeah, two things with regard to that. I think if this court finds the judge was wrong about the law, we win on the first claim, on the due process issue. Mr. Maloney did not have notice. So the second thing I would say in terms of whether there was any kind of strategic reason that Mr. Maloney would have tried to capitalize on that confusion, and that was the second point I was going to make here, there's been a lot of discussions of strategic reasons that Mr. Maloney may or may not have had. In that discussion, the Commonwealth is asking this court to ascribe to Mr. Maloney reasons that there's no evidence in the record of at this point. We need a hearing on this. We requested a hearing on this, and in order for those concerns about whether there was a strategic reason for this, a reasonable strategic reason for this to be resolved, there needs to be a hearing on this. Is he still around? I believe he is. I talked to him about a year ago. I think we actually looked it up before coming out here today. But my understanding is he is still around, and I believe a hearing would be possible. So there does need to be a hearing on that. If the question is whether there was a reasonable strategic reason for this, there needs to be a hearing on that. The other thing with regard to the Jones case that I wanted to point out in terms of timing and prejudice issue, because the district court's ruling was based on timing, and that timing consideration under the law is based on prejudice to the other side. In the Jones case, in which this court found a remand for an amendment to consider for a full consideration of the issues being raised pursuant to Martinez, that was filed two and a half years later. The case was already in the Court of Appeals. So certainly any prejudice would have been greater in that case than in this case, where the case was already in the Court of Appeals and a remand was necessary. Mr. Cregall also discussed Grounds 7 and Grounds 14 as arguments where we did bring ineffective assistance of counsel claims that hadn't been brought. By the way, you mentioned that the case is already in the Court of Appeals. Martinez already was quite far along in its appellate journey, too, wasn't it? When it was first raised? By the time it was raised, it had been decided. I believe it had been, Your Honor. I don't know off the top of my head. It was decided by the Supreme Court and four days later. Oh, yes. So it didn't just pop up. It had been wending its way through the court system. And the issue was teed up. Yes. And it wasn't raised earlier. My understanding is yes, that's correct. I believe that's correct. Your Honor, he had mentioned Grounds 7 and 14 as claims that we did raise, even though there were procedural default issues. Our argument as to those claims was that there was no default. The district court actually found as to Grounds 7 there was no default. And as to Grounds 14, the court found that there was a partial default, but not a full default, and considered that as to some of those. So those were not frivolous. Were those defaults that there was a dispute? Yes. Were those defaults in the collateral level or in the appellate level? The collateral level. They were in the trial collateral. Yes, I believe they were. Because I took your reply brief to be saying that all of the examples that he came up with were in the appellate level rather than the trial collateral level. But you're saying now, at least with those two, they were at the trial collateral level. Your Honor, it's absolutely possible I'm wrong on that. I think the briefs. I appreciate it. I wasn't on the case at that level, so I'm not as familiar with the issues that I wasn't a part of. But I think the briefing and things will reflect that. Thank you. I see that your time has expired, counsel. The court thanks you very much for taking the case under the Criminal Justice Act. Thank you. You did a very nice job. Thank you, Judge. Thank you. We have your matter. We will take it under advisement and issue an opinion in due course. Thank you.